489 P.2d 666

The MESCALERO APACHE TRIBE,
Appellant,

v.

Franklin JONES, Commissioner of the Bureau of Revenue of the State of New Mexico and the Bureau of Revenue of the State of New Mexico, Appellees.

No. 635.

Court of Appeals of New Mexico.

Aug. 6, 1971.

Rehearing Denied Sept. 7, 1971.

Certiorari Denied Oct. 6, 1971.

S. Thomas Overstreet, Fettinger, Bloom & Overstreet, Alamogordo, for appellant.

David L. Norvell, Atty. Gen., John C. Cook, Special Asst. Atty. Gen., Santa Fe, for appellees.

## OPINION

HENDLEY, Judge.

The Bureau of Revenue (Bureau) imposed a compensating tax on the Mescalero Apache Tribe, d/b/a Sierra Blanca Ski Enterprises (Tribe) based upon the purchase price of materials used to construct two ski lifts. The Bureau also imposed an emergency school tax on the gross receipts of the operation of the ski resort. The Tribe protested the compensating tax assessment and also filed a claim of refund for the sums paid under the emergency school tax assessment. The Bureau ruled adversely on the Tribe's protest of the compensating tax assessment and the claim of refund of the school taxes. The Tribe appeals directly to this court pursuant to § 72–13–39, N.M.S.A.1953 (Supp.1969).

We affirm.

This appeal is based upon a stipulation of facts entered into by the Tribe and the Bureau, a summary of which is as follows. The Tribe is a treaty tribe residing on reservation lands situated within the counties of Lincoln and Otero in the State of New Mexico and has adopted a constitution in accordance with governmental regulations. The ski resort is also located in Lincoln and Otero Counties and is on lands belonging to the United States Forest Service under a thirty year lease to the Tribe, except for some of the cross-country ski trails which are on reservation lands. No part of the ski resort buildings or equipment are located within the boundaries of the Tribe's reservation. The basic purpose of the ski

resort is to provide revenue which is used for educational, social and economic welfare of the Tribe. The ski resort also provides a job training center for approximately twenty to thirty tribal members. The purchase and construction of the ski resort was totally financed by a loan from the Federal Government pursuant to 25 U.S.C.A. § 470. The approval of the Bureau of Indian Affairs of the Department of Interior is required for the ski resort budget for each fiscal year, leasing of equipment or other property, leasing facilities to concessionaires, plans and designs for construction of additional facilities or improvements, disposal of property other than expendable items, form and contents of monthly interim reports and accounting records and other related areas dealing with the ski resort.

On appeal the Tribe asserts: (1) the State has no authority to tax the Tribe; (2) assuming it has authority to tax the Tribe, the State, in its statutes, has not attempted to tax the Tribe; and (3) the Tribe is exempt from taxation because it is a federal instrumentality.

## 1. AUTHORITY TO TAX.

The Tribe contends that the State has no authority to tax because: (a) exclusive jurisdiction over the Tribe is vested in the Federal Government; (b) it is inconsistent with the Treaty between the Tribe and the Federal Government; and (c) it interferes with the Tribe's right to self-government.

(a) *Exclusive Jurisdiction.*

It is the Tribe's contention that the Treaty between the Tribe and the United States Government, which became effective March 25, 1883, vests exclusive jurisdiction over the Tribe in the Federal Government. Article I of the Treaty states:

"Article 1. Said nation or tribe of Indians through their authorized Chiefs aforesaid do hereby acknowledge and declare that they are lawfully and exclusively under the laws, jurisdiction, and government of the United States of America, and to its power and authority they do hereby submit."

The Tribe further contends that this argument is buttressed by Article I, Section 8 of the United States Constitution which states that the United States Congress shall have power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes; * * *"

We agree with the Tribe on this general proposition, but we must call attention to the fact that the Tribe submitted to the United States "power and authority." Subsequently, the United States Congress, on June 20, 1910, 36 Statutes at Large, 557, ch. 310, enacted the Enabling Act for New Mexico. Section 2, second, after stating that Indian land shall be under the absolute jurisdiction and control of the Congress of the United States, stated in part:

"* * * [B]ut nothing herein, or in the ordinance herein provided for, shall preclude the said State from taxing, as other lands and other property are taxed, any lands and other property outside of an Indian reservation owned or held by any Indian, save and except such lands as have been granted or acquired as aforesaid or as may be granted or confirmed to any Indian or Indians under any Act of Congress, but said ordinance shall provide that all such lands shall be exempt from taxation by said State so long and to such extent as Congress has prescribed or may hereafter prescribe."

This Enabling Act is a specific grant of power which was later incorporated into Article XXI, Section 2, of the New Mexico Constitution wherein the almost identical language was adopted.

Consequently, by virtue of the Enabling Act the Federal Government permitted the State of New Mexico to tax, "* * * as other lands and other property are taxed, any lands and other property outside of an Indian reservation owned or held by any Indian."

The Tribe contends that under Article VI, (Clause 2), of the United States

Constitution, when there is a conflict between a Treaty and the provision of a State Constitution or statute, regardless of whether the State constitutional or statutory provision is prior to or subsequent to the making of the Treaty, the Treaty will control. United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). We agree with this general proposition, however, we do not find the Treaty to be in conflict with the provisions of the New Mexico Constitution or any of its statutes when the tax is on lands or properties located off Indian land. The Treaty submits the Tribe to the laws of the United States, and the Enabling Act permits New Mexico to tax in this situation.

■ The Tribe contends the lease of the Federal Forest Service lands was an acquisition of land under 25 U.S.C.A. § 465, which permits the Secretary of Interior to acquire lands within or without existing reservations for the purpose of providing lands for Indians. 25 U.S.C.A. § 465 provides that title to "any lands or rights acquired" pursuant to 25 U.S.C.A. § 470 shall be exempt from State taxation. The purchase and construction of the ski resort was financed by a loan under 25 U.S.C.A. § 470. Assuming the Tribe's leasehold rights and its interest in the ski resort facilities are land, or rights acquired in land, a proposition we do not decide, the exemption from State taxation is also to land, or rights acquired in land. The tax involved here applies neither to land nor to rights acquired in land. The tax under the old "compensating or use tax" is on tangible personal property, see § 72–17–3, N.M.S.A. 1953 (Repl. Vol. 10, pt. 2) and under the Emergency School Tax Act on the privilege of engaging in business activities within New Mexico. See § 72–16–4.1, N.M.S.A.1953 (Repl. Vol. 10, pt. 2); see Edmunds v. Bureau of Revenue, 64 N.M. 454, 330 P.2d 131 (1958). The exemption under 25 U.S.C.A. § 465 does not apply in this case.

We have considered the Tribe's other contentions and cited cases, but find them distinguishable on the facts and under the law above cited.

(b) *The Taxation Being Inconsistent with the Treaty.*

■ The Tribe relies upon Articles 9, 10 and 11 of the Treaty when read with Article 1, cited above, for the proposition that the Treaty imposed a duty on the United States Government to pass legislation and do other acts to insure the permanent prosperity and happiness of the Tribe and that the United States Government is duly bound by this Treaty to make donations, gifts and implements to the Tribe. The Tribe contends that it would be inconsistent with those purposes for the State of New Mexico to be allowed to disrupt the scheme of the Federal Government by permitting an imposition of New Mexico taxes on the Tribe.

We fail to see the merit of the argument. In reviewing the other Articles of the Treaty, the apparent purpose of the Treaty was to insure the Tribe of certain lands and of certain freedoms on tribal lands but it did not include freedom from a situation as disclosed by the facts of this case.

We do not pass judgment on the contention of the Tribe that the Federal Government is interested in the financial success of the Tribe's operation of a ski resort; however, we fail to see, in light of the foregoing Treaty and Enabling Act provisions, how the Federal Government intended to exempt the Tribe from taxation for activities and operations occurring off Indian lands. The Enabling Act itself denies this contention.

(c) *Interference with Tribe's Right to Self-Government.*

■ We agree with the Tribe's contention that if the imposition of a State tax on the Tribe interferes with the Tribe's right to reservation self-government the tax must fail. Ghahate v. Bureau of Revenue, 80 N.M. 98, 451 P.2d 1002 (Ct.App.1969). The Tribe claims such interference in this case even though the taxes involved arose from

and because of operations conducted by the Tribe on non-Indian land. The claim is based on the fact that revenue derived from the ski resort operation is used for the welfare of the Tribe and the resort provides job training for members of the Tribe. These facts show no interference with reservation self-government. The Tribe contends, however, that it *might* interfere because the power to tax is the power to destroy and: "The purpose for which the appellant entered into the ski resort operation is being frustrated and possibly could even be totally defeated if New Mexico is allowed to tax the operation." There are no facts showing a present frustrated purpose; the remainder of the argument is no more than speculation. There being no factual basis for the claim, it is rejected. Compare Organized Village of Kake v. Egan, 369 U.S. 60, 80 S.Ct. 562, 7 L.Ed.2d 573 (1962); McClanahan v. State Tax Commission, 14 Ariz.App. 452, 484 P.2d 221 (1971).

## 2. AUTHORITY TO TAX THE TRIBE WHICH THE STATE HAS NOT ATTEMPTED TO TAX.

■ It is the Tribe's contention here that since it is not specifically named in § 72–17–2(e), N.M.S.A.1953 (Repl. Vol. 1961) of the Compensating Tax Act, and § 72–16–2(A), N.M.S.A.1953 (Repl. Vol. 1961) of the Emergency School Tax Act (both repealed July 1, 1967, and both taxes were for periods of time prior to the repeal), that they are excluded on the basis that general acts do not apply to State statutory authority to tax the Tribe. See Chouteau v. Commissioner of Internal Revenue, 10 Cir., 38 F.2d 976 (1930); compare Southern Union Gas Company v. New Mexico Public Service Commission, 82 N.M. 405, 482 P.2d 913 (1971).

No claim is made that the Tribe does not come within the definition of "person" in §§ 72–17–2(e) and 72–16–2(A), supra. The claim is simply that to be taxable, the Tribe must have been specifically named. We disagree. Whatever may be the current validity of the concept that Indians could not

be taxed unless specifically named, the Enabling Act specifically permitted the taxation "as other lands and other property are taxed, any lands and other property outside of an Indian reservation owned or held by any Indian. * * *" With this specific federal legislative permission, we see no basis in reason, in New Mexico, for the concept that Indians must be specifically named to be included within a statute of general application. The Enabling Act states that Indian property, in the situation in this case, is to be taxed as other property is taxed.

## 3. TRIBE EXEMPT FROM TAXATION BECAUSE IT IS A FEDERAL INSTRUMENTALITY.

■ It is the Tribe's contention here that even assuming New Mexico does have authority to tax the Tribe, and assuming further that the Tribe comes within the definition of "person" in the taxing statutes, the Tribe is exempt because it is a federal instrumentality.

The Tribe cites the Handbook on Federal Indian Law, U. S. Printing Office (1958) at page 853, for the proposition that insofar as the instrumentality doctrine is concerned, it relates to Indians, their property and their affairs. We do not agree with the Tribe on this general proposition. The Tribe's argument is based on the fact that it is a Tribe and its ski resort operation is financed and supervised by the Federal Government. These facts, in our opinion, are insufficient to support a conclusion that the ski resort is virtually an arm of the United States Government, see dissenting opinion of Justice Marshall in First Agricultural Nat. Bank v. State Tax Commission, 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1963), and cases cited therein; certainly the ski resort is not essential for the performance of governmental functions, but, even if the ski resort could be considered a federal instrumentality, the immunity of the resort from taxation is removed by the provisions of our En-

abling Act previously discussed in this opinion.

Affirmed.

It is so ordered.

Wood, C. J., concurs.

SUTIN, Judge (specially concurring).

I specially concur only because the Mescalero Apache Tribe or Sierra Blanca Ski Enterprises, I.D. No. 14–703019–00, which owns the ski resort, is a federal Indian chartered corporation, pursuant to 25 U.S.C.A., §§ 477 and 470.

The fact of being a chartered corporation does not appear in the stipulation. Nevertheless, it states:

\* \* \* \* \* \*

7. The purchase and construction of the ski resort was financed completely by a loan to the Tribe by the federal government under 25 U.S.C.A. Section 470.

25 U.S.C.A., § 470 provides that the Secretary of the Interior " \* \* \* may make loans to Indian chartered corporations for the purpose of promoting the economic development of such tribes and of their members, \* \* \* "

25 U.S.C.A., § 477 provides that the Secretary of the Interior may issue a charter of incorporation to a tribe. It further provides:

Such charter may convey to the *incorporated tribe* the power to purchase \* \*, or otherwise own, hold, manage, operate and dispose of property of *every* description, real and personal, \* \* \* *and such further powers as may be incidental to the conduct of corporate business,* not inconsistent with law, \* \* \*. Any charter so issued shall not be revoked or surrendered except by Act of Congress. [Emphasis added.]

Article XI, Section 1(a) of the Tribe's Revised Constitution is a part of the stipulation. It provides that the Mescalero Apache Tribal Council has the duty and power to transfer tribal property and other assets to tribal corporations.

The Mescalero Apache Tribe states in its reply brief:

The issue of a federally chartered corporation under Section 477 is not present in this case.

To me, this constitutes an admission that the Tribe, or Sierra Blanca Ski Enterprises is an Indian chartered corporation. This corporation should be taxed.

The Notice of Assessment of Taxes by the Commissioner was made to Sierra Blanca Ski Enterprises, not to the Tribe. The title of the Protest of Assessment filed by the Tribe refers to Sierra Blanca Ski Enterprises. The Tribe stated it was the "owner and operator of Sierra Blanca Ski Enterprises." In the title to the stipulation of the facts and the decision and order of the Commissioner, it is described as "Mescalero Apache Tribe, d/b/a Sierra Blanca Ski Enterprises, I.D. No. 14–703019–00." The Tribe was taxed in this name because probably it led the Commissioner to believe it was not a chartered corporation.

If the assumptions of corporate life in this specially concurring opinion are wrong, and called to the attention of this court on motion for rehearing, I will dissent. I do not agree that an Indian Tribe is subject to payment of the state compensating tax or school tax assessments.

This appears to be the first state tax case against an Indian chartered corporation or tribe. Let us take a look at the history of corporate Indian tribes.

Cohen's Handbook of Federal Indian Law, p. 277, states:

In the narrow sense in which the term is frequently used, a corporation is something chartered by a government, and in this sense only those Indian tribes which have been chartered by some government, e. g., the Pueblos of New Mexico incorporated by territorial legislation, and the tribes incorporated under section 17 of the Act of June 18, 1934, [25 U.S.C.A., § 477] are to be considered corporations.

See United States v. Lucero, 1 S.M. 422, 438 (1869).

In·Cohen's supra, pp. 278, 279, the author says:

Thus· it has been administratively determined that the Pueblos of New Mexico are entitled to receive grazing privileges under the Taylor Grazing Act, under the clause in section 3 of that act conferring such rights upon "corporations authorized to conduct business under the laws of the State." The principle involved would appear to be equally applicable to any Indian tribe which has a recognized corporate status, either under the Act of June 18, 1934, or otherwise.

See also Cohen's, supra, p. 399, wherein it is said:

The corporate status of the Pueblos has been recognized in many cases.

The corporate status of Pueblo Indian communities, created in 1847, is still alive in New Mexico. Section 51–17–1, N.M.S.A. 1953 (Repl.Vol. 8, pt. 1). This section gave the Indian Pueblos the status of bodies politic and corporate, and, as such, empowered them to sue in respect of their lands. Lane v. Pueblo of Santa Rosa, 249 U.S. 110, 39 S.Ct. 185, 63 L.Ed. 504 (1918); Garcia v. United States, 43 F.2d 873 (10th Cir. 1930).

In 1904, the Supreme Court of New Mexico held taxable the lands of the Pueblo Indians in New Mexico. Territory v. Delinquent Tax List, 12 N.M. 139, 76 P. 307 (1904).

The Tribe claims 25 U.S.C.A. § 465 is a restraint on state's activities. This section applies to title to lands taken in the name of the United States in trust for the Indian tribe or individual Indian. Such lands are exempt from state and local taxation. Chartered Indian corporations are not covered by this section. But see, Martinez v. Southern Ute Tribe, 150 Colo. 504, 374 P.2d 691 (1962).

Under the state taxing acts, a "person" includes a corporation. They do not exclude Indian chartered corporations. Neither is the Indian chartered corporation exempt from payment of taxes. If it were intended to be an instrumentality of the United States, it would have been so stated in 25 U.S.C.A. § 477.

It might be noted that § 72–13–79, N.M. S.A.1953 (Repl. Vol. 10, pt. 2, Supp.1969), of the Tax Administration Act, adopted in 1965, provides:

Liens will attach or levy may be made by terms of any provision of the Tax Administration Act * * * to or on property belonging to the United States of America or to an Indian tribe, an Indian pueblo or any Indian only to the extent allowed by law.

Here again, the Indian chartered corporation is omitted.

Some states "have been given jurisdiction by federal statute over the reservations within their borders. The tribes within these states no longer exercise governmental functions independent of the state. Moreover, Congress has authorized all states to extend jurisdiction over tribes within their borders by official act" with tribal consent. 25 U.S.C.A., §§ 1321–22 (Supp.1970); 82 Harvard Law Review 1343. New Mexico has not moved toward assumption of jurisdiction.

The Mescalero Apache Tribe has left the confines of its reservation. It has donned the robes of a corporation to join its competitors in business. It stood high in its tradition as a separate "nation." It now stands strong in its business and cultural development. As it earns money from citizens of this country, it should carry the same burdens of taxation as its competitors. It may even continue in additional ventures in business in every phase of corporate life. New Mexico should welcome this adventure as much as it has welcomed others to come in the last 123 years.

In my opinion, an Indian chartered corporation operating on non-Indian land is subject to the compensating tax and school tax of this state.

For these reasons, I specially concur.